1998 SD 26

**Lana SUTHERLAND, Employee and Appellee,**

v.

**QUEEN OF PEACE HOSPITAL, Employer and Appellant,**

and

**Presentation Sisters Worker's Compensation Trust, Self–Insurer and Appellant.**

**No. 20060.**

Supreme Court of South Dakota.

Considered on Briefs Dec. 3, 1997.

Decided March 18, 1998.

Rehearing Denied April 22, 1998.

N. Dean Nasser, Jr. and James R. Even of Nasser Law Offices, Sioux Falls, for appellee.

Michael S. McKnight and Lisa Hansen Marso of Boyce, Murphy, McDowell and Greenfield, Sioux Falls, for appellants.

MOSES, Circuit Judge.

[¶ 1.] Queen of Peace Hospital (Hospital) appeals the circuit court's order reversing a Department of Labor (Department) decision that denied Lana Sutherland's (Sutherland) claim for vocational rehabilitation benefits and granted her loss of use benefits. We affirm, in part, and reverse, in part.

## FACTS

[¶ 2.] On January 23, 1991, Sutherland sustained a work related injury to her back while employed as an operating room technician/circulating registered nurse at Hospital. After the injury and physical rehabilitation, Hospital offered and Sutherland accepted, employment as a Central Registration Registered Nurse (CRN) at Hospital.

[¶ 3.] It is undisputed and stipulated by Sutherland that she was physically able to fulfill all the duties of the CRN position. It is further undisputed and stipulated by Sutherland that she was paid more per hour in the CRN position when she began ($11.48) than she was paid in her previous RN position ($11.04). In addition, the hours per week were the same in both the RN and CRN job and both jobs received the same pay raises.

[¶ 4.] The CRN department at Hospital consisted of three employees. In an effort to accommodate Sutherland, and to fill an existing need, Hospital offered and Sutherland accepted the new CRN position. The CRN position involved utilizing nursing judgment, maintaining direct contact with patients, obtaining and reviewing admission orders, taking orders from doctors for procedures, educating patients, verifying physician orders, taking patients' health histories, giving testing instructions, scheduling patient testing, and telephone and typing work.

[¶ 5.] Sutherland contends she suffered from discomfort and pain while performing her CRN duties, despite the fact that the job description was within her restrictions and limitations prescribed by her treating physician. In addition to the physical discomfort of the CRN job, Sutherland became depressed as a result of her dissatisfaction with the CRN job. Sutherland contended that she is a "people person" and preferred to be more directly involved in patient care. Sutherland sought other jobs that involved direct patient care, but claims neither she nor the hospital found any she could physically perform. Hospital disputes this, claiming there were jobs available within her physical limitations, but Sutherland chose not to apply. Sutherland asserts she was also concerned about the job insecurity of the CRN job and the lack of transferable skills (loss of job access), fearing that if she lost her job at the hospital, she would be unemployable.

[¶ 6.] On December 31, 1992, Sutherland resigned her CRN position at the hospital, and elected to pursue further education as a physician's assistant. This decision was not based on the recommendation of her rehabilitation expert, nor was it due to Sutherland's inability to work as a registered nurse. Instead, Sutherland's decision to leave the CRN position was primarily due to her dissatisfaction with the extent of her direct patient contact in the CRN position. However, during Sutherland's physician's assistant schooling, she chose to remain with Hospital in a temporary "on call" basis.

[¶ 7.] In January 1994, Sutherland completed her physician's assistant program and started her job as a physician's assistant with Dr. Sorrels in Mitchell, South Dakota, earning $30,000 per year for forty hours per week.

[¶ 8.] Hospital paid Sutherland medical costs and temporary total, temporary partial, and permanent partial disability following her injury. In addition, it has been stipulated that Sutherland timely requested and petitioned for loss of use and rehabilitation benefits under SDCL 62–4–5.1. Department awarded benefits of twelve percent for loss of use, but twice denied rehabilitation benefits, determining Sutherland could return to her usual and customary line of employment and that she did not need retraining to obtain suitable, substantial and gainful employment.

[¶ 9.] The circuit court held the Department's decisions on these issues were clearly erroneous or an abuse of discretion. The circuit court awarded fifty-two weeks of rehabilitation benefits plus prejudgment interest and denied an additional twenty-eight percent loss of use benefits. Hospital appeals the awarding of the vocational rehabilitation benefits. Sutherland appeals in notice of review that she should be awarded twenty-eight percent for loss of use benefits.

## STANDARD OF REVIEW

[¶ 10.] Our standard of review, as stated in SDCL 1–26–36, requires us to give great weight to the findings and inferences made by the Department on factual questions. *Sopko v. C & R Transfer Company, Inc.*, 1998 SD 8, ¶ 6, 575 N.W.2d 225; *Helms v. Lynn's, Inc.*, 1996 SD 8, ¶¶ 9–10, 542 N.W.2d 764, 766; *Finck v. Northwest Sch. Dist. No. 52–3*, 417 N.W.2d 875, 878 (S.D. 1988). We examine agency findings in the same manner as the circuit court to decide whether they were clearly erroneous in light of all the evidence. *In re Northwestern Bell Tel. Co.*, 382 N.W.2d 413, 415 (S.D.1986). "We will reverse only if we are definitely and firmly convinced that a mistake has been made." *Loewen v. Hyman Freightways, Inc.*, 1997 SD 2, ¶ 7, 557 N.W.2d 764, 766 (quoting *Spitzack v. Berg Corp.*, 532 N.W.2d 72, 75 (S.D.1995)). Questions of law are fully reviewable. *Sopko*, 1998 SD 8, ¶ 6, 575 N.W.2d 225; *Caldwell v. John Morrell & Co.*, 489 N.W.2d 353, 357 (S.D.1992); *Egemo v. Flores*, 470 N.W.2d 817, 820 (S.D.1991).

[¶ 11.] In *Sopko*, 1998 SD 8, ¶ 7, 575 N.W.2d 225, we held the proper standard of review in administrative appeals is "clearly erroneous," rather than the "substantial evidence" analysis. We concluded:

> To allay future confusion over the proper standard of review in administrative appeals, we will no longer employ 'substantial evidence' terminology. In the past, we have regularly combined clearly erroneous and substantial evidence principles, but the latter is not the proper test. SDCL 1–26–36 was amended effective July 1, 1978, changing the standard of review for sufficiency of the evidence from 'unsupported by substantial evidence on the whole record' to 'clearly erroneous.' (For reasons unknown the definition remains unrepealed. SDCL 1–26–1(9)). The difference between the two standards should not be obscured: It is simply inaccurate to conclude, findings supported by substantial evidence are not clearly erroneous. 1 S. Childress & M. Davis, *Federal Standards of Review* § 2.07 at 2–44 (2d ed. 1992) (citing cases from every federal circuit). Even when substantial evidence supports a finding, reviewing courts must consider the evidence as a whole and set it aside if they are definitely and firmly convinced that a mistake has been made. *See W.R.B. Corp. v. Geer*, 313 F.2d 750, 753 (5th Cir.1963); *cert. denied*, 379 U.S. 841, 85 S.Ct. 78, 13 L.Ed.2d 47 (1964).

(footnote omitted).

## ANALYSIS AND DISCUSSION

### [¶ 12.] I. Whether the denial of rehabilitation benefits was clearly erroneous?

[¶ 13.] An injured employee's entitlement to rehabilitation benefits is governed by SDCL 62–4–5.1.[1] We have interpreted this statute on numerous occasions and have established a five-part test for awarding rehabilitation benefits:

1. The employee must be unable to return to his usual and customary line of employment;

2. Rehabilitation must be necessary to restore the employee to suitable, substantial, and gainful employment;

3. The program of rehabilitation must be a reasonable means of restoring the employee to employment;

4. The employee must file a claim with his employer requesting the benefits; and

5. The employee must actually pursue the reasonable program of rehabilitation.

*Hendrix v. Graham Tire Co.*, 520 N.W.2d 876, 883 (S.D.1994); *Chiolis v. Lage Dev. Co.*, 512 N.W.2d 158, 160 (S.D.1994); *Beckman v. John Morrell & Co.*, 462 N.W.2d 505, 507 (S.D.1990); *Cozine v. Midwest Coast Transp., Inc.*, 454 N.W.2d 548, 553 (S.D. 1990).

1. Whether Department's determination that Sutherland was able to return to her usual and customary line of employment is clearly erroneous?

[¶ 14.] In regard to the first requirement, Sutherland must show that she cannot return to her usual and customary line of employment. *Cozine*, 454 N.W.2d at 553. A person's usual and customary line of employment may be determined by many factors, such as, the skills or abilities of the person, the length of time the person has

---

1. At the time of Sutherland's injury, this statute provided:

   If an employee suffers disablement as defined by subdivision 62–8–1(3) or an injury and is unable to return to his usual and customary line of employment, the employee shall receive compensation at the rate provided by § 62–4–3 up to sixty days from the finding of an ascertainable loss if the employee is actively preparing to engage in a program of rehabilitation. Moreover, once such employee is engaged in a program of rehabilitation which is reasonably necessary to restore the employee to suitable, substantial and gainful employment, the employee shall receive compensation at the rate provided by § 62–4–3 during the entire period that he is engaged in such program. The employee shall file a claim with his employer requesting such compensation and the employer shall follow the procedure specified in chapter 62–6 for the reporting of injuries when handling such claim. If the claim is denied, the employee may petition for a hearing before the department.

spent in the type of work, the proportion of time the person has spent in the type of work when compared to the worker's entire working career, and the duties and responsibilities of the person at the workplace. *Beckman,* 462 N.W.2d 505.

[¶ 15.] Sutherland argues her "usual and customary line of employment" is in direct patient care nursing, primarily as a circulating nurse/operating room technician, and her injury prohibits her from continuing that line of work. Because Sutherland cannot return to her circulating nurse/operating room technician position, she contends that she can no longer take part in her "usual and customary line of employment" of direct patient care nursing, and should be awarded rehabilitation benefits.

[¶ 16.] Hospital argues Sutherland's "usual and customary line of employment" was that of a registered nurse, and therefore, the CRN position was within her "usual and customary line of employment."

[¶ 17.] It is undisputed that Sutherland received her nursing degree in 1988, and thereafter, was employed as an RN until she quit her CRN job in December 1992. During the course of Sutherland's employment as an RN, she held the positions of ward secretary, medical floor RN, clinic RN, operating room technician, and circulating RN. Sutherland's duties and responsibilities in these positions included answering telephone questions, transcribing orders, scheduling tests, running lab equipment, assessing patients, assisting patients, preparing patient rooms, assisting in surgery, and cleaning medical instruments.

[¶ 18.] In Sutherland's argument, she relies on *Beckman, supra,* where the employee suffered a work related injury and lost total use of one hand. Beckman maintained that his "usual and customary line of employment" was that of a heavy production line worker and the position required full use of both hands, the ability to complete repetitive movements with both hands, and the ability to lift heavy objects. Thus, Beckman contended he could no longer work in his usual line of employment. The employer, John Morrell & Co., argued Beckman's "usual and customary line of employment" was that of general labor and it could assign him to a number of different work duties, which required only the full use of one hand. Department determined that Beckman's "usual and customary line of employment" was manual labor, "involving repetitive movement and heavy lifting" and that he was unable to return to this line of employment. *Id.*

[¶ 19.] Hospital argues the present case is distinguishable from the *Beckman* case. We agree. In *Beckman,* the employee did not possess or develop any transferable skills while employed at Morrell. His only ability was manual labor. Unlike Beckman, Sutherland was well educated, acquired numerous technical skills, and had various duties, responsibilities, and positions during her employment as an RN. Thus, Sutherland possessed and developed skills which were clearly transferable in the nursing field. Sutherland's previous employment and education demonstrate the CRN position was within her "usual and customary line of employment." In addition to the CRN position, which involved similar tasks, required a nursing degree and three years of nursing experience, Sutherland's skills and experience qualified her for other positions that were within her physical limitations.[2]

[¶ 20.] Considering the *Beckman* factors together with Sutherland's skills and abilities, length of employment, percentage of time employed in work, and duties and responsibilities, it is demonstrated that Sutherland's line of employment was that of a registered nurse. *See Beckman,* 462 N.W.2d 505. Sutherland's employment history did not strictly consist of positions involving direct patient care, but rather, consisted of a number of positions with a variety of responsibilities within the medical nursing field. Clearly, Sutherland was able to be employed as an RN utilizing her skills and abilities, as well as past experiences, to perform the duties of a CRN.

---

**2.** Sutherland's expert, Rick Ostrander, testified she was able to perform other positions as an RN that were within her physical limitations, including health education, clinic work, industrial nursing, and school health.

[¶ 21.] Department found the CRN position required an RN degree, utilized nursing judgment, had been in existence for several years at Hospital, was needed by Hospital, involved the taking of medical histories from or providing medical information to patients, and was physically suitable for Sutherland. Department further found Sutherland had been trained as an RN, had worked in this capacity for the majority of her working life, and was able to be perform other positions as an RN that were within her physical limitations. Our task on appeal is to determine whether the agency's decision was clearly erroneous. *Sopko*, 1998 SD 8, ¶ 7, 575 N.W.2d 225. Therefore, in light of all the above and our review of the record, we conclude Department's finding that Sutherland failed to carry her burden of showing she is unable to return to her "usual and customary line of employment" was not clearly erroneous.

2. Whether Department's determination that Sutherland failed to show rehabilitation was necessary to return her to suitable, substantial and gainful employment is clearly erroneous?

[¶ 22.] In regard to the second requirement, Sutherland must show rehabilitation is reasonably necessary to restore her to "suitable, substantial, and gainful employment." *Cozine*, 454 N.W.2d at 553 (citing SDCL 62–4–5.1). "[O]nce an employee has made a prima facie case showing that she is unable to find suitable employment, the employer then has the burden of establishing that the employee would be capable of finding such employment without rehabilitation." *Hendrix*, 520 N.W.2d at 883 (citing *Cozine*, 454 N.W.2d at 554). SDCL 62–4–5.1 requires "more than the mere restoration to employment, however. 'The new employment must be suitable when compared to the employee's former job.'" *Id.* (quoting *Beckman*, 462 N.W.2d at 508) (employment at minimal wages does not constitute suitable, substantial, and gainful employment); *see also Chiolis*, 512 N.W.2d at 160.

[¶ 23.] Sutherland relies on *Kurtenbach v. Frito Lay*, 1997 SD 66, 563 N.W.2d 869, to support her position that the CRN job was not "suitable" employment. Kurtenbach, whose main duty was to service and maintain existing delivery routes, was injured on the job. Following the injury, he was unable to continue to work for his employer, and sought retraining. His employer argued retraining was unnecessary because there were numerous "sales jobs available which would restore him to 'suitable, substantial, and gainful employment.'" *Id.* at 873.

[¶ 24.] Department disagreed and found Kurtenbach was primarily a delivery driver, and the sales positions suggested by the employer would not return him to "suitable, substantial, and gainful employment." As a route salesperson, Kurtenbach took over an existing route and his main responsibility was to service his customers. Department further found, and this Court agreed, that his former position could not be compared to the salesmanship required of a successful auto dealer. "One knows the product and wants to have it available to his consumer. The other must convince the ultimate buyer of the value of the product." *Id.* at 873.

[¶ 25.] This case is clearly distinguishable from *Kurtenbach*. Unlike *Kurtenbach*, the CRN position in which Sutherland was offered and accepted was "suitable, substantial, and gainful employment." The CRN position required an RN degree, three years nursing experience, was not a "favored" work job, was within her physical limitations, and was similar to her previous duties an RN. We agree with the Department in their findings that suitable employment was available to Sutherland on a regular and continuous basis which resulted in the same or better wage, benefits, hours, and pay raises.

[¶ 26.] Sutherland also relies on the testimony presented by her vocational rehabilitation expert, Rick Ostrander. Ostrander testified that Sutherland conducted a diligent job search and was not able to find many positions within her physical limitations. Sutherland contends she has met her burden of proof in establishing that no "suitable, substantial, and gainful" employment existed, and the hospital, in turn, failed to meet their burden. We disagree.

[¶ 27.] "The fundamental purpose of rehabilitation benefits is to insure that an injured worker has an opportunity to develop

marketable and transferable skills that enable her to secure suitable, substantial, and gainful employment." *Beckman,* 462 N.W.2d at 509; *Barkdull v. Homestake Mining Co.,* 411 N.W.2d 408, 410 (S.D.1987)(*Barkdull II* ). An injured worker cannot insist upon rehabilitation benefits if other suitable employment opportunities exist which do not require training. *See Cozine,* 454 N.W.2d at 554. Here, Sutherland was already working in suitable, substantial, and gainful employment as a CRN before she commenced her retraining program. Sutherland never requested any job modifications and there is no documentation in her medical records suggesting psychological or medical problems which would prevent her from performing her CRN position. Furthermore, Sutherland's vocational rehabilitation specialist, Ostrander, played no role in her decision to obtain a physician's assistant degree. Clearly, Department's finding that the CRN position was within Sutherland's physical limitations and constituted "suitable" employment is not clearly erroneous. In addition, there is no evidence to suggest this employment was not regularly and continuously available to Sutherland.

■ [¶ 28.] The record is clear that suitable employment opportunities existed for Sutherland. Throughout her employment, Sutherland developed marketable and transferable skills in her various duties as an RN. Hospital has met its burden and presented proof that Sutherland was able to work in the CRN department at Hospital, starting at her pre-injury wage, and earning more by the time she left. In addition, Department found Sutherland elected not to apply for positions within her area of training, despite the fact they were within her physical limitations.[3] While the physician's assistant degree may enhance Sutherland's employability, the lack of it did not prohibit her from employability as an RN. "While such self-improvement is highly laudable," particularly in view of Sutherland's independent quest for it, "unaided by the employer or carrier, it is outside the range of benefits provided by South Dakota

law." *Chiolis,* 512 N.W.2d at 161. It was Sutherland's right to seek further education, but Hospital cannot be compelled to pay for such a program if it is not necessary. *Cozine,* 454 N.W.2d at 554. Therefore, in light of all of the above and our review of the record, Department was not clearly erroneous in finding that Hospital met its burden in showing rehabilitation was not necessary to restore her to suitable, substantial, and gainful employment.

[¶ 29.] **II. Whether Sutherland is entitled to an additional twenty-eight percent loss of use benefits if rehabilitation benefits are denied?**

■ [¶ 30.] In her notice of review, Sutherland asserts that she should be awarded an additional twenty-eight percent loss of use benefit if the rehabilitation request is denied. We disagree.

[¶ 31.] In *Cozine,* 454 N.W.2d at 551–52, this Court held:

SDCL 62–4–6 specifies the amount of compensation an employee shall receive for the loss of a part of the body or its loss of use. The clear language of this statute directs that compensation shall be paid for loss of use. Consequently, the hearing examiner must determine if, and to what extent, a claimant has suffered the loss of use of a part of the body. This determination requires more than a mere adoption of a medical evaluation of anatomical impairment.

\*   \*   \*   \*   \*   \*

Although the medical impairment rating given by a doctor is an important factor, the extent of loss of use does not necessarily equal the extent of medical impairment. . . .

The physician who makes a determination about impairment must keep in mind that a permanent impairment rating is not the same as a disability rating. Permanent medical impairment is related directly to the health status of the individual, whereas disability can be determined only within the context of the

---

**3.** Hospital established the following positions were open in Sutherland's community, and were within her physical limitations: (1) Patient Educator, (2) Infection Control/Employee Health/Workers Compensation Coordinator, (3) Education Development Director, and (4) Central Registration Nurse. In addition, there were other positions open that Sutherland did not desire and that she assumed were not were within her physical limitations.

personal, social, or occupational demands, or statutory or regulatory requirements that the individual is unable to meet as a result of the impairment. A medical impairment rating simply is not intended to measure loss of use.

*Id.; see also Caldwell,* 489 N.W.2d at 362.

[¶ 32.] "[A] disability rating due to a 'loss of use' of a body member can, under the provisions of SDCL 62-4-6, only be considered in the context of what effect it would have on the employee's income-earning capability and that any effect it has on his personal or social life is not a relevant consideration." *Caldwell,* 489 N.W.2d at 362.

[¶ 33.] Sutherland's expert, Rick Ostrander, testified that Sutherland sustained a forty percent loss of earning capacity that results from a lower wage level that she could expect throughout her life, and a decreased work-life expectancy. Ostrander further testified that with retraining, Sutherland's loss was twelve percent, because regardless of rehabilitation, she would suffer a reduction in the capacity of her earnings. We agree with Department that Ostrander's opinions are foundationally sound and reliable. Therefore, the only remaining issue is which percentage of loss of use is more appropriate, twelve percent or forty percent.

[¶ 34.] Sutherland argues that if her rehabilitation claim is denied, she is entitled to the forty percent loss of use as calculated by Ostrander without consideration for the retraining. Sutherland relies on *Kurtenbach* to support her position that her *Cozine* benefit should not be reduced. In *Kurtenbach,* the request for rehabilitation benefits was denied. However, this Court remanded for a determination of Kurtenbach's loss of use because he had never been assigned a loss of use disability rating. This Court held, "Department is required to assign him a loss-of-use rating, and has not properly fulfilled its statutory duty. SDCL 62-4-6. Therefore, we remand for a determination of Kurtenbach's loss of use." *Kurtenbach* at 876. Here, unlike *Kurtenbach,* Department determined, based on Ostrander's testimony, Sutherland's loss of use post-rehabilitation was twelve percent.

[¶ 35.] Sutherland also relies on *Cozine* in support of her argument that her loss of use benefits should remain at forty percent. She states, "Despite the fact that rehabilitation benefits were denied in *Cozine,* the Supreme Court did not reduce the *Cozine* benefit, and the employer had to pay the same *Cozine* benefit as it would have had to pay if the employee had been retrained." This is a misstatement of the case. In *Cozine,* this Court determined the hearing examiner was not clearly erroneous in concluding Cozine's four-year college rehabilitation program was not reasonably necessary for her rehabilitation. However, we held the hearing examiner improperly refused to consider evidence other than a medical impairment rating in determining loss of use. Therefore, this Court remanded for a proper determination of the loss of use benefits based on all the evidence and testimony.

[¶ 36.] Loss of use benefits and rehabilitation benefits are two separate issues. Rehabilitation benefits are based on the five factors listed in *Cozine.* Loss of use benefits are limited to a Sutherland's loss in income earning capacity. *See generally Cozine,* 454 N.W.2d at 552-53. Here, the fact remains that Sutherland has been retrained. This retraining, as Ostrander testified, reduces her loss of use disability to twelve percent. Regardless of who paid for the retraining, Sutherland's loss of use is now twelve percent.

[¶ 37.] The issue before this Court is whether the agency's determination was clearly erroneous. *Sopko,* 1998 SD 8, ¶¶ 6-7, 575 N.W.2d 225. Based on the above we conclude the agency's determination is not clearly erroneous.

[¶ 38.] The circuit court is reversed with respect to the award of rehabilitation benefits. The judgment is affirmed with respect to the twelve percent loss of use award.

[¶ 39.] MILLER, C.J., and AMUNDSON, KONENKAMP and GILBERTSON, JJ., concur.

[¶ 40.] MOSES, Circuit Judge, for SABERS, J., disqualified.